UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.'s    18-CR-20256-Martinez
              15-CR-20170-Moore

UNITED STATES OF AMERICA,          :
                                   :
            Plaintiff,             :
                                   :
v.                                 :
                                   :
RAUL SOSA, SR.,                    :
                                   :
            Defendant.             :
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

## MOTION FOR COMPASSIONATE RELEASE RESENTENCING
## AND REQUEST FOR HOME CONFINEMENT

The Defendant, RAUL SOSA, SR., through undersigned counsel, respectfully requests this Court to exercise its authority under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018, to resentence Mr. Sosa in light of his multiple serious health conditions, recent hospitalization, and the danger to him presented by the Covid-19 virus spreading throughout the Bureau of Prisons.  Mr. Sosa's heightened susceptibility to serious illness or death from contracting the virus because of his diabetes, heart disease, and Gallbladder disease, weigh in favor of a sentence reduction to home confinement.

**I.    Procedural History**

1.    On November 10, 2015, Mr. Sosa was convicted after trial for conspiracy to defraud the United States and making and subscribing false tax returns.  He was sentenced to a total sentence of 78 months in prison.  This sentence consisted of 60 months on the conspiracy count followed by a consecutive sentence of 18 months for

the tax counts.

2.      On April 5, 2018, while serving the sentence imposed for his tax conviction, Mr. Sosa was Indicted for various offenses arising from a scheme to bribe city officials in Opa Locka to obtain towing contracts.  (DE 3 in Case No. 18-Cr-20256).  On May 30, 2018, Mr. Sosa pleaded guilty to Count One of a Superseding Indictment charging him with Conspiracy to Commit Federal Programs Bribery, in violation of 18 U.S.C. § 371.

3.      On August 28, 2018, Mr. Sosa was sentenced to 30 months imprisonment for Case Number 118-CR-29256-Martinez to run consecutively with the 78-month total sentence he was already serving for Case Number 15-CR 20170-Moore.

## II.    Mr. Sosa's Incarceration

4.      Mr. Sosa has been incarcerated since November 10, 2015, serving the sentence imposed following his tax conviction.  Because the sentence on Mr. Sosa's bribery case was ordered to run consecutively, the Bureau of Prisons indicates that he is not scheduled to be released from incarceration until July 10, 2023.  *See* attached Exhibit A.

5.      Mr. Sosa has been a model prisoner with no disciplinary actions taken against him for the entire time he has been incarcerated.

6.      Mr. Sosa is not in good health.  At 57 years old, he is obese, and suffers from medical conditions including arterial hypertension, Type II diabetes, arterio-sclerosis, heart disease, and gastro-esophageal reflux. Mr. Sosa is insulin dependent and takes fourteen prescription medications each day to treat his health conditions.  Most recently, on May 6, 2020, Mr. Sosa was rushed to the hospital due to complications involving his gallbladder. Although there is a great deal that is still unknown about the Covid-19 virus, one thing is

clear; if Mr. Sosa were to contract the virus, he would be at a high risk of suffering life-threatening complications.

7.      On April 17, 2020, Mr. Sosa submitted a request, through undersigned counsel, to the Warden at FCI-Miami requesting approval for a motion pursuant to 18 U.S.C § 3582(c)(1)(A), for compassionate release.  *See* e-mail attached as Exhibit B. On April 18, 2020, a response was received stating "[w]e have received your request and are processing pursuit to Home Confinement under the First Step Act and Attorney General Barr March 26, 2020 Directive COVID-19 Home Confinement Memorandum and it will be processed accordingly."  *See* email attached as Exhibit C.  Last week, Mr. Sosa was informed by his case manager that he did not meet the criteria for COVID-19 home detention consideration and was provided a note to sign acknowledging this. *See* notice attached as Exhibit D.  Both the letter presented to Mr. Sosa and the position taken by his case manager rely on incorrect interpretations of BOP Policy statements Given the urgent circumstances here, Mr. Sosa is seeking relief from this Court.

8.      If released, Mr. Sosa's wife, Maura Sosa will drive to pick up Mr. Sosa. Maura Sosa has access to Protective Personal Equipment, including masks and gloves. She will wear a mask and gloves for the drive. She will bring a second set for Mr. Sosa to wear on the ride back. Mr. Sosa will reside with his wife.  The home has several bedrooms. One bedroom and bathroom will be designated for Mr. Sosa in order for him to self-quarantine for 14 days.

9.      Given these circumstances, Mr. Sosa asks this Court to reduce his sentence to enter an order releasing Mr. Sosa to serve the remainder of his custodial sentence on home-detention and ordering his immediate release from B.O.P. custody.

**III.**   **Under the First Step Act, this Court has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify Mr. Sosa's Sentence and Release Him to Home Confinement.**

The First Step Act ("FSA") expressly permits Mr. Sosa to move this Court to reduce his term of imprisonment and seek compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. *Id.* On April 17, 2020, counsel transmitted Mr. Sosa's request to the warden of FCI-Miami via email, fax and U.S. Mail.  Mr. Sosa was later advised that he does not meet the criteria for COVID-19 home detention consideration.  In light of the urgent nature of this motion, Mr. Sosa files this motion now.

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." *See, e.g.*, *Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020). However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments. *United States v. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28, 2019); *see also Ebbers*, 2020 WL 91399, at *4. Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn.

Mar. 4, 2020) (collecting cases).

### A. The Unprecedented Nature of this Emergency Compels the Court to find the Need for Exhaustion Requirement Waived.

Although §3582(c)(1)(A) plainly imposes an administrative exhaustion requirement, the United States Supreme Court has held that, even in such circumstances, an exception exists where "the interests of the individual weigh heavily against requiring administrative exhaustion." *See McCarthy v. Madigan*, 503 U.S. 140, 146 (1992); *See also Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019). ("Even where exhaustion is seemingly mandated by statute . . . , the requirement is not absolute."). The Court need not and should not wait for Mr. Sosa to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to Mr. Sosa. *See generally Washington*, 925 at 109, 120–21. ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.").

Federal courts (including in this district) have found that they can hear applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency. *See United States v. Martha Lima*, No. 16 Cr. 20088 (S.D.F.L. May 11, 2020), ECF Docket No. 137; *United States v. Donald Platten,* No. 08 Cr. 80148*,* (S.D.F.L. April 17, 2020), ECF Docket No. 155; *United States v. William Minor*, No. 18 Cr. 80152 (S.D.F.L. April 17, 2020), ECF Docket No. 35; *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF Docket No. 642 (D. Mass. Mar. 17, 2020) (granting defendant's emergency motion based on COVID-19); *see also United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov. 12,

2019) (hearing and granting emergency compassionate release application of prisoner with cancer). This accords with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes. *See, e.g., Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (*citing Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative exhaustion requirements can be waived if delay would cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)). Those policies were articulated by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749 (1975):

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

422 U.S. at 765.

Conducting an "intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in *Bowen* that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the

Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place." 476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); *see also Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J. concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the impending crisis, the unique exhaustion provision in § 3582(c)(1)(A) places this case squarely within *Bowen*'s holding. Under § 3582(c)(1)(A), exhaustion will "merely [ ] enable [Defendants] to receive the procedure they should have been afforded in the first place"—it will simply advance by what could be a crucial thirty days this Court's consideration of Mr. Sosa's motion for compassionate release. *Bowen*, 476 U.S. at 484. To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be brought *either* by the "Director of the Bureau of Prisons, *or* upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . ." 18 U.S.C. § 3582(c)(1)(A) (emphasis added). In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear disputes in the absence of exhaustion. *Cf. Booth v. Churner*, 532 U.S. 731, 736 (2001) (failure to exhaust under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action

cannot be maintained in federal court because that provision explicitly provides that "*[n]o action shall be brought* with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added)).

Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept through BOP facilities).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days. § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier . . . ." (emphasis added)). With this provision, Congress implicitly recognized that the policies underlying compassionate release are not furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic process. Congress' concerns about delay are even more pronounced in the current public health crisis.

The policies underlying such requirements would not be furthered by strict adherence in this instance. Giving the BOP time to decide administrative applications

for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise." *Salfi*, 422 U.S. at 765. The BOP already has provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release. *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. Thus, it would be futile to force defendants to exhaust their administrative remedies—at the cost of their health and, potentially, their lives.

With the speed and unpredictability of this pandemic, waiting even 30 days will be detrimental. Accordingly, this Court should exercise jurisdiction over Mr. Sosa's emergency motion for compassionate release and dispense with the BOP requirements under 18 U.S.C. § 3582(c)(1)(A)(i).

**B.**     **"Extraordinary and compelling reasons" warrant a reduction in Mr. Sosa's sentence.**

1.     COVID-19 is a public health disaster that threatens vulnerable incarcerated persons like Mr. Sosa.

The COVID-19 pandemic continues to roil the United States. As of May 12, 2020, the country has 1,402,225 confirmed positive cases, and approximately 83,120 deaths.[1] COVID-19 is already sweeping through the city's jails and prisons, too. As of May 12, 2020, at least 2,818 inmates and 262 BOP staff have tested positive for COVID 19.[2] To date, BOP has reported 50 inmate deaths as a result of COVID19.[3]  The numbers are likely higher, as testing is limited. *See, e.g.*, *In the Matter of the Extradition of Manrique*,

---

[1] https://www.worldometers.info/coronavirus/country/us/
[2] http://www.bop.gov/coronavirus
[3] *Id.*

2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (expressing concern about the infection rate within BOP facilities given that "people are not being tested").

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. *See* Joseph A. Bick (2007). *Infection Control in Jails and Prisons. Clinical Infectious Diseases* 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.[4] Despite the general lockdown, BOP continues to transport inmates to and from facilities and has confirmed, on March 25, 2020, that it will not stop admitting new inmates.[5]  This exacerbates the risk of transmission. Though the BOP emphasizes that it screens inmates before moving them, as the *Manrique* Court put it: "the [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up and we don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.

This Court is already aware of the extensive reports of the efforts taken to stem the spread of COVID-19 in jail and prison settings and the inevitable inadequacy of

---

[4] Federal Prison Workers Say Conflicting Orders on Coronavirus Response is Putting Lives at Risk, CBS News (March 19, 2020), available at https://www.cbsnews.com/news/coronavirus- prison-federal-employees-sayconflicting-orders-putting-lives-at-risk-2020-03-19; Danielle Ivory, 'We Are Not a Hospital': A Prison Braces for the Coronavirus, N.Y. Times (Mar. 17, 2020), available at https://www.nytimes.com/2020/03/17/us/coronavirusprisons-jails.html; Martin Kaste, Prisons and Jails Worry About Becoming Coronavirus 'Incubators.'" NPR (March 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming- coronavirus-incubators.

[5] Luke Barr, Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates: Sources, ABC News (March 23, 2020), https://abcnews.go.com/Health/warnings- bureau-prisons-transporting-inmates-sources/story?id=69747416%22.

such measures, and we will not belabor those here. *See, e.g.*, Ned Parker et al., *Spread of Coronavirus Cccelerates in U.S. Jails and Prisons*, Reuters, March 29, 2020, available at https://www.reuters.com/article/us-health-coronavirus-usa-inmates-insigh/spread-of-coronavirusaccelerates-in-us-jails-and-prisons-idUSKBN21F0TM.

Decarceration in this context is not only a public health imperative. It is also a humanitarian imperative.

        2.    Mr. Sosa's vulnerability to COVID-19 due to his high medical risk is an extraordinary and compelling reason that warrants home confinement.

Mr. Sosa is particularly vulnerable to COVID-19 as he is 57 years old, overweight, is suffering from medical conditions that include: arterial hypertension, gastro-esophageal reflux disease, Type II diabetes mellitus and arterio-sclerosis heart disease. He recently suffered a heart attack and is currently hospitalized for complications involving his gall bladder. He takes approximately 10 medications a day in order to function and is not receiving the required insulin doses as needed due to the lockdowns in place.[6]

These are an "extraordinary and compelling reasons" for his release. *See* Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), *see* Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Mr. Sosa's high

---

[6] "People who have chronic medical conditions, such as diabetes, lung disease and heart disease, face an increased chance of being hospitalized with covid-19 and put into intensive care, according to data released by the Centers for Disease Control and Prevention that is consistent with reports from China and Italy. The new data gives the most sweeping look at the way covid-19 is causing serious illnesses among people in the United States who already face medical challenges. The report reinforces a critically important lesson: Although the disease is typically more severe among older people, people of any age with underlying medical conditions are at increased risk if they contract the virus, for which there is no vaccine or approved drug treatment." Joel Achenbach & William Wan, New CDC Data Shows Danger Of Coronavirus For Those With Diabetes, Heart Or Lung Disease, Other Chronic Conditions, Washington Post (March 31, 2020).

susceptibility to COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the limitations in a prison environment on practicing the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Mr. Sosa suffers from ailments that have already been identified as "high risk," this Court should find that Mr. Sosa's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to U.S. General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible."[7] And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its

---

[7] https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf

likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

Finally, in the last few days, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island.[8] Approximately 1,700 inmates have been released from Los Angeles County Jails,[9] and 1,000 inmates are to be released from New Jersey jails.[10] Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

## IV.  Granting Relief is consistent with the Policy Statement and the § 3553(a) factors.

When considering a compassionate release request, the Court must also find that a sentence reduction is "consistent with applicable policy statements issued by the [United States] Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The Policy Statement in USSG §1B1.13 suggest that, in determining whether Mr. Sosa's sentence should be reduced, the Court should first decide whether the defendant presents a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). U.S.S.G. §1B1.13(2). Mr. Sosa was convicted of a nonviolent offense and

---

[8] https://www.cnbc.com/2020/03/24/coronavirus-new-york-city-to-release-300-nonviolent-inmates-from-rikersisland.html
[9] https://www.dailynews.com/2020/03/24/l-a-county-releases-1700-inmates-from-jail-early-to-prevent-coronavirusoutbreak-behind-bars/
[10] https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html

he has been a model prisoner. Mr. Sosa poses no risk to any person or the community as a whole.

The Sentencing Guidelines also instruct the Court to consider the sentencing factors set forth in 18 U.S.C. § 3553(a) when deciding a motion for compassionate release.

Given that Mr. Sosa suffers from significant health issues that make him exceptionally vulnerable to COVID-19, he asks the Court to grant his motion for compassionate release, allowing him to leave the prison facility before a potentially fatal outbreak of COVID-19 strikes FCI-Miami. There should be little doubt that the current pandemic – involving a highly transmissible and extraordinarily dangerous virus which poses a severe threat of death to a person with Mr. Sosa's medical profile – constitutes an extraordinary and compelling reason warranting compassionate release.

## V. If Released to Home Detention Mr. Sosa Has A Stable and Safe Home to Live In.

Mr. Sosa has a release plan. He will live with his wife in their home. The home has several bedrooms, including a bedroom with an attached bathroom that Mr. Sosa can use while observing the quarantine protocol for 14 days following release. Mr. Sosa's wife, Maura Sosa will pick him up from prison and has access to personal protective equipment (PPE) that can be supplied to Mr. Sosa until he is beyond any quarantine period.

This environment will be significantly better than FCI-Miami, where despite the BOP's best efforts, Mr. Sosa is constantly at risk from contamination both from within and without the prison walls, and where access to PPE for inmates is essentially non-existent.

## VI.    Conclusion

For the foregoing reasons, Mr. Sosa respectfully requests that the Court reduce his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home confinement, and/or direct the BOP to use its authority under 34 U.S.C. § 60541(g) and 18 U.S.C. § 3624(c)(2) to release him immediately.  Alternatively, Mr. Sosa requests a telephonic hearing as soon as possible.

Undersigned counsel contacted AUSAs Ed Stamm and Michael Davis regarding the relief requested in this motion.  Both advised that they will advise this Court as to their position when they've had the opportunity to obtain and review Mr. Sosa's medical records from the BOP.

**WHEREFORE**, the Defendant, RAUL SOSA, SR., through undersigned counsel, respectfully requests this Court to exercise its authority under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018, to resentence Mr. Sosa in light of his multiple serious health conditions, recent hospitalization, and the danger to him presented by the Covid-19 virus spreading throughout the Bureau of Prisons.

Respectfully submitted,

Paul D. Petruzzi, Esq.
**Law Offices of Paul D. Petruzzi, P.A.**
8101 Biscayne Blvd.
Penthouse 701
Miami, FL 33138
Telephone: (305) 373-6773
Facsimile:   (305) 373-3832
E-mail: petruzzi-law@msn.com

By:     /s/ Paul D. Petruzzi
        **PAUL D. PETRUZZI, ESQ.**
        Florida Bar No. 982059

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 13, 2020, a true and correct copy of this document was furnished by CM/ECF to all counsel of record.

By:     /s/ Paul D. Petruzzi
        **PAUL D. PETRUZZI, ESQ.**
        Attorney for Defendant